577 F.2d 825
 6 O.S.H. Cas.(BNA) 1451, 1978 O.S.H.D. (CCH) P 22,637
AMERICAN IRON AND STEEL INSTITUTE, Jones & Laughlin Steel
Corporation, National Steel Corporation, Sharon Steel
Corporation, Shenango, Incorporated, United States Steel
Corporation, Wheeling-Pittsburgh Steel Corporation,
Petitioners in Nos. 76-2358 and 76-2371,
Republic Steel Corporation, Petitioner in Nos. 76-2359 and 76-2372,
Bethlehem Steel Corporation, Petitioner in No. 76-2424,
Armco Steel Corporation, Petitioner in No. 76-2629,
Crucible Materials Group and Colt Industries, Inc., Cyclops
Corporation, Inland Steel Company, Petitioners in
No. 76-2630,
Youngstown Sheet and Tube Company, Petitioner in No. 77-1016,
American Coke and Coal Chemicals Institute, Petitioner in No. 77-1025,
C F & I Steel Corporation, Petitioner in No. 77-1088,
v.
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, UNITED STATES
DEPARTMENT OF LABOR, United States of America, Respondent,
United Steelworkers of America, AFL-CIO, Intervenor.
 Nos. 76-2358, 76-2359, 76-2371, 76-2372, 76-2424, 76-2629,
76-2630, 77-1016, 77-1025 and 77-1088.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 5, 1978.
Decided March 28, 1978.
 
 Max O. Truitt, Jr., Michael S. Schooler, Wilmer, Cutler & Pickering, Washington, D. C., for petitioners in Nos. 76-2358, 76-2371, 76-2424, 76-2629, 76-2630, 77-1016, 77-1025; Robert R. Morris, Hacker & Morris, Washington, D. C., Raymond T. Cullen, Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.
 David J. Toomey, Frank E. Morris, Pennie & Edmonds, New York City, for petitioner in Nos. 76-2359 and 76-2372; Edward P. Weber, Jr., Republic Steel Corp., Cleveland, Ohio, Joseph W. Swain, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., of counsel.
 Miles C. Cortez, Jr., Welborn, Dufford, Cook & Brown, Denver, Colo., for petitioner in No. 77-1088.
 Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Allen H. Feldman, Asst. Counsel for Appellate Litigation, Dennis K. Kade, Charles I. Hadden, Attys., U. S. Dept. of Labor, Washington, D. C., for respondent.
 George H. Cohen, Bredhoff, Gottesman, Cohen & Weinberg, Washington, D. C., James D. English, United Steelworkers of America, Pittsburgh, Pa., for intervenor; Bernard Kleiman, Chicago, Ill., of counsel.
 OPINION OF THE COURT
 Before ROSENN and HIGGINBOTHAM, Circuit Judges, and VAN ARTSDALEN, District Judge.*
 ROSENN, Circuit Judge.
 
 
 1
 These consolidated cases present petitions for review[1] of a new health standard governing employee exposure to coke oven emissions promulgated by the Secretary of Labor ("Secretary") on October 19, 1976, pursuant to the Occupational Safety and Health Act ("the Act"), 29 U.S.C. § 651 et seq.[2] In summary, the standard prescribes particular controls and procedures to reduce coke oven employees' exposure in specified regulated areas to toxic emissions in concentrations no greater than 0.15 mg. of the benzene-soluble fraction of total particulate matter (BSFTPM) per cubic meter of air (0.15 mg/m 3) present during the production of coke averaged over an eight-hour period. Additionally, the standard provides that if the prescribed controls do not reduce emission concentrations to the permissible exposure limit, employers would be required to provide respirators and to take additional steps to curtail excess emissions by conducting independent research and development.
 
 
 2
 Petitioners, coke manufacturers and their trade associations, make three principal claims: (1) the exposure limit of 0.15 mg/m 3 (milligrams per cubic meter of air) is invalid under the statute because there is no substantial evidence of health need for the prescribed exposure limit, and there is no evidence to support the feasibility of that limit; (2) the Secretary has exceeded his statutory power by combining a performance standard with specific required engineering and work practice controls and by requiring the coke manufacturers to conduct open-ended research to develop additional control technology, if necessary, to achieve the permissible exposure limit; (3) there is no substantial evidence to support the need for the specified various mandated controls and procedures[3] such as quarterly monitoring of employee exposure, prescribed protective clothing and hygiene facilities, the extent of the area to be regulated, engineering controls, and work practices.
 
 I.
 BACKGROUND
 
 3
 Coke is utilized primarily by steel producing companies as a fuel in blast furnaces and foundries. It is the product of the destructive distillation of coal usually produced by heating coal in an inert atmosphere in a coke oven battery.
 
 
 4
 A coke oven battery is a huge rectangular structure, typically 200 or more feet long, 40 to 60 feet wide, and up to 50 feet in height. The battery is subdivided by refractory brick walls into a series of narrow ovens, approximately 18 inches wide and 13 to 20 feet high extending the full width of the battery. Between each oven are heating flues that burn gas derived from the coal to maintain high temperatures. This heating process causes the carbonization of the coal, resulting in the formation of the coke, a porous cellular substance, and various volatile gases. Each oven is provided with three or four charging holes in its roof through which coal is dropped into the oven, and two doors, one at each end of the oven, which are removed at the end of the coking cycle so that the incandescent coke can be pushed from the oven into the quench car. As the coal is coked, a considerable amount of gas generates. Almost all of it is captured and burned in the heating flues of the coke oven battery. This gas is removed from each oven through one or two vertical ducts, called stand pipes or ascension pipes, which are connected by horizontal ducts, called goosenecks, to one or two collector mains. In brief, coke production consists of three distinct operations: "charging," "coking," and "pushing."
 
 
 5
 The charging process begins by loading coal into a larry car which operates on a rail on top ("topside") of the battery. There are three or four coal hoppers or bins on the larry car for transferring coal from a coal bunker to the charging hold. After the coal is unloaded into the oven it is levelled to create a space between the coal and the oven so the gas evolved during the coking process can collect. To minimize escape of these gases, a process called "charging on the main" has been developed. The gases are forced out of the oven by "steam jet aspiration" through a stand pipe and into a "gooseneck" for transmittal to the collecting main. During the trip through the gooseneck, the gases are sprayed with condensation, "flushing liquor," from the collecting main. Prior to charging, a lid man removes the lids on the charging holes of the empty oven. The larry car operator then positions the car over the empty oven and he and the lid man then let the coal out of a hopper into the oven.
 
 
 6
 The second operation in the coking process is the heating of the ovens. The ovens are heated from 14 to 36 hours at temperatures of 2000o F. or more. After the heating is completed at the end of the coking cycle, the coke is ready for the third operation, the removal ("pushing") from the oven. A pusher machine on which is mounted a mechanical ram for pushing the coal from the oven is stationed in front of the oven's "push side door." The door is removed as is the door on the oven's opposite side, the "coke side door." The ram forces the coke out of the oven through the coke side door into a railroad car, the "quench car." The quench car carries the hot coke to the "quench tower" where it is cooled with water and then dumped onto the "coke wharf." Finally, it is conveyed to the screening stations for sizing. It is then ready for use.
 
 
 7
 The hazards to coke oven employees stem from the escape of volatile gas byproducts, a danger present at all three stages of the coking process. The composition of the gas from the coke oven varies with the type of coal, its moisture content, and the extent to which the coal has been coked. The gas contains numerous hydrocarbons and at varying times also includes particulate matter and tars. Emissions can leak out into the work place areas immediately adjacent to the ovens through the charging hole during the charging process. Because coke oven batteries are operated at extremely high temperatures and are subject to considerable thermal stress which often produces minute cracks in coke ovens, gas can leak from the ovens during the coking process. Emissions also can leak through the oven doors during the push, and from the quench car while the coke is carried to the quench tower. Finally, if for some reason the coal has not been thoroughly coked by the time it is pushed, the uncoked coal will precipitate a "green push" generating substantial gas emissions and characterized by flames shooting out of the coke mass with dense black smoke enveloping the entire area of the battery.
 
 
 8
 Efforts to reduce employee exposure to coke oven emissions began officially in 1969. The Secretary of Labor, acting under the authority of the Walsh-Healey Act, 41 U.S.C. §§ 35-45 (1970), adopted a 1967 recommendation of the American Conference of Governmental Industrial Hygienists that occupational exposures to "coal tar pitch volatiles" ("CTPV") be limited to 0.2 mg/m 3 on an eight hour day.[4] In 1971, the Secretary adopted that standard as an "established federal standard" pursuant to section 6(a) of the Act, 29 U.S.C. § 655(a) (1970). Later that same year, the American Iron and Steel Institute ("AISI") petitioned the Secretary to develop a standard designed specifically for coking operations, while the United Steelworkers of America petitioned the Secretary to formulate a more stringent performance standard. The petitions were both denied, pending expedited research conducted by the National Institute for Occupational Safety and Health ("NIOSH") in the development of criteria for an appropriate standard.
 
 
 9
 The NIOSH report was issued in February 1973 and, in essence, concluded that: (1) because existing data was inadequate to determine safe coke oven emission levels, the existing .2 mg/m 3 coal tar pitch volatile standard should be retained; (2) application of feasible engineering controls and work practices were the most efficient means to control emission leakage.
 
 
 10
 In August 1974, the Secretary established a Standards Advisory Committee on Coke Oven Emissions to review the NIOSH criteria report and to prepare recommendations for a new standard protecting employees from exposure to coke oven emissions as distinct from other material falling within the broad coal tar pitch volatile category. Members of the committee, experts in their respective fields, included among their number an epidemiologist, a public health expert, industrial hygienists representing the employers, and union members. After lengthy hearings, on-site inspections, and review of documents, the Advisory Committee submitted a majority and dissenting 3500 page report in May 1975. Drawing upon the various studies before him, the Secretary published on July 24, 1975, his own "Proposed Standard" for coke oven emissions. He set the proposed exposure limit at 0.3 mg of respirable particulate matter ("RPM") per cubic meter of air. The area to be regulated included any coke plant area where the permissible exposure limit was exceeded. Furthermore, the proposed standard identified various engineering controls and work practices which seemed effective in curtailing emissions exposure although such controls and procedures were not mandated under the proposed standard. OSHA conducted hearings on the proposed standard between November 1975 and May 1976 with respect to all issues.
 
 
 11
 The final standard was promulgated in October 1976. As we noted earlier, it establishes a permissible exposure limit to the benzene-soluble fraction of total particulate matter (BSFTPM) of 0.15 mg/m 3. The regulated area covers the coke oven batteries, topside, push side, and coke side, with their attendant machinery, the battery ends, the quenching tower, wharf and screening station. Quarterly monitoring of exposure levels for each shift in each job classification in the regulated area is also provided. To reach the permissible limits, an extensive list of engineering and work practices to be implemented at each battery is ordered. Finally, the standard provides that if the permissible exposure limit has not been met after implementing all the specified controls, the employers must provide respiratory equipment and they must undertake open-ended research and development until they have developed technologies which will achieve compliance.
 
 
 12
 In December 1976 petitioners AISI and American Coke and Chemical Institute ("ACCI") applied to the Secretary for a stay of the effective date of certain of the standard's provisions or for alternative relief. The Secretary denied that petition in January 1977. Petitioners then moved this court for a stay. The court granted an interim stay pending decision on the motion, denied the motion on February 18, 1977, and vacated the interim stay. This petition for review, for which we have jurisdiction under section 6(f) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 655(f) (1970), followed.
 
 
 13
 We affirm the standard but vacate the sections pertaining to research and development requirements and the requirement of a quantitative fit test for respirators.
 
 II.
 THE STANDARD OF REVIEW
 
 14
 Our standard of review in this case is statutorily mandated by section 6(f) of the Act, 29 U.S.C. § 655(f), which provides in pertinent part:
 
 
 15
 The determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole.
 
 
 16
 In Synthetic Organic Chemical Manufacturers v. Brennan, 503 F.2d 1155 (3d Cir.) cert. denied, 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1970) ("SOCMA I "), this court set forth a five-step process for reviewing the Secretary's safety standard under section 6(f):
 
 
 17
 (1) determine whether the Secretary's notice of proposed rulemaking adequately informs interested persons of the action taken;
 
 
 18
 (2) determine whether the Secretary's promulgation adequately sets forth reasons for his action;
 
 
 19
 (3) determine whether the statement of reasons reflects consideration of factors relevant under the statute;
 
 
 20
 (4) determine whether presently available alternatives were at least considered; and(5) determine whether substantial evidence in the record as a whole supports the Secretary's determination, if it is based in whole or in part on factual matters subject to evidentiary development.
 
 
 21
 Id. at 1160.
 
 
 22
 As is typical in the multifaceted character of judicial review of legislative standards resulting from informal rulemaking, we are concerned with intricate questions pertaining to fact-finding, policy making, and statutory construction. The framework around which we must build our decision involves an examination of scientific facts, economic considerations and statutory markings. Underlying our approach to the questions presented is, of course, a recognition of the congressional mandate to protect the health of industrial employees and to weigh the burdens of an important but currently beleaguered industry.
 
 
 23
 As we examine the regulation at issue in this case, it is imperative to distinguish between determinations bottomed on factual matters, and non-factual, legislative-like policy decisions. It is only the former that we subject to the "substantial evidence" test. The evidence in support of a fact-finding is "substantial" when "from it (the evidence) an inference of the fact may be drawn reasonably." B. Schwartz, Administrative Law 595 (1977). In such a case, the reviewing court must uphold the finding "even though (it) would justifiably have made a different choice had the matter been before it de novo." Palmer v. Celebrezze, 334 F.2d 306 (3d Cir. 1964), quoting Universal Camera Corp. v. Labor Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1950).
 
 III.
 
 24
 THE VALIDITY OF THE PERMISSIBLE EXPOSURE LIMIT OF 0.15 MG/M 3 BSFTPM
 
 
 25
 In determining the validity of an exposure limit of 0.15 mg/m 3 BSFTPM, two major questions must be addressed: Is there substantial evidence supporting the conclusion that the ambient atmosphere of a coke oven contains particulate matter to which there is no safe level of exposure? Is the Secretary's limit feasible as required by section 6(b)(5)? We will discuss each of these questions in turn.
 
 A. Carcinogenicity and safe exposure levels
 
 26
 The record in this case supports the Secretary's findings, never disputed by any of the parties,[5] that there is substantial evidence that coke oven emissions are carcinogenic. Dr. Eula Bingham, then associate professor of environmental health at the University of Cincinnati's Medical School and chairman of the Secretary's Advisory Committee (now Assistant Secretary of Labor for OSHA), concluded unequivocally in her testimony before OSHA that "there is overwhelming scientific evidence that coke oven emissions are carcinogenic," and hence, "the ambient atmosphere of coke ovens is a carcinogen rich environment."
 
 
 27
 Evidence of carcinogenicity has been derived from chemical analysis and various epidemiological studies. Such studies indicate a significantly higher rate of mortality among coke oven workers than the general population. For example, the rate of mortality for lung cancer among employees working on top of the coke oven batteries for five or more years is ten times greater than normal. Furthermore, the incidence of contracting various nonmalignant respiratory diseases bronchitis, emphysema, pneumoconiosis is also substantially increased, particularly for long term workers.
 
 
 28
 Having established the existence of a health hazard created by coke oven emissions, the Secretary endeavored to ascertain a safe level of exposure. Edward Baier, Deputy Director of NIOSH, testified in hearings that it is impossible to set a safe threshold exposure limit above zero for a carcinogen. In a 1970 report to the Surgeon General entitled "Evaluation of Environmental Carcinogens" the Ad Hoc Committee on the Evaluation of Low Levels of Environmental Chemical Carcinogens stated, "no level of exposure to a chemical carcinogen should be considered toxicologically insignificant for man. For carcinogenic agents a safe level for man cannot be established by application of our present knowledge. The concept of 'socially acceptable risk' represents a more realistic notion." The Ad Hoc Committee's report substantially summarizes the opinions of numerous experts that there were no known safe exposure levels at the time to carcinogens. Finally, the majority report of the Secretary's Advisory Committee based its recommendations to the Secretary on the finding that "coke oven emissions are carcinogenic and there is no scientific data to demonstrate that there is a safe level of exposure to carcinogens . . . ."[6]
 
 
 29
 The Secretary's factual determination that coke oven emissions are carcinogenic and that there is no absolutely safe level of exposure to them is supported by substantial evidence in the record. Therefore, we have no difficulty in concluding that the Secretary's effort to meet a perceived health need by establishing an exposure limit to coke oven emissions was proper. The proprieties of setting the limit to 0.15 mg/m 3 BSFTPM, however, presents greater difficulties.[7]
 
 B. Feasibility of the standard
 
 30
 Section 6(b)(5) of the Act requires, inter alia, that the Secretary " shall set the standard which most adequately assures, to the extent feasible, on the basis of best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard . . . for the period of his working life." 29 U.S.C. § 655(b)(5) (1970). In attempting to formulate the lowest possible exposure limit, the Secretary is constrained by the requirement of feasibility, both technological and economic. American Federation of Labor v. Brennan, 530 F.2d 109, 122 (3d Cir. 1975). We will now examine each aspect of the feasibility requirement.
 
 
 31
 (1) Technological feasibility
 
 
 32
 The Secretary set the exposure limit at 0.15 mg/m 3 BSFTPM relying primarily on NIOSH tests conducted at U.S. Steel's Fairfield, Alabama plant considered the most modern and clean coke oven battery operating in the United States. Fifty measurements were taken at various job positions around the battery over a three-day period. The NIOSH data showed that exposure levels were below the 0.15 mg/m 3 BSFTPM level on at least one of the days for each job classification tested. Although those low-level readings constituted only one-third of the total samples taken, the Secretary noted that the Fairfield battery had not implemented all of the specific engineering controls that are now required in the standard. In view of this data, along with data from other batteries, in particular the Bethlehem Steel coke battery in Johnstown, Pennsylvania, where exposure in one job classification dropped from 6.4 mg/m 3 to 0.38 mg/m 3 after new engineering controls were implemented, and testimony concerning new alternative coke production techniques and emission controls, the Secretary concluded that the prescribed standard was technologically feasible. To account for initial difficulties, the standard mandates that while these controls are being implemented, or where the standard is, for some reason, not technologically feasible, then the health needs of coke oven employees require use of respirators wherever the exposure limit is exceeded.
 
 
 33
 The petitioners advance several arguments supporting their contention that the prescribed exposure limit is not feasible. First, petitioners attack the Secretary's reliance on the NIOSH test at the Fairfield batteries. Petitioners suggest that if the measurements taken at the newest, cleanest batteries indicate that the limit can be met only one-third of the time then not only would it be difficult for the best batteries to meet the prescribed limits, but it would be next to impossible for the older batteries to meet it. Petitioners also contest the validity of the data on which the Secretary relies. Coke oven batteries are subject to different temperatures, wind, and humidity, depending on their geographical location and seasonal changes. Petitioners argue that the Fairfield data, measuring exposure in one location and over only three consecutive days, could not possibly yield an accurate representation of the exposure levels at Fairfield, let alone at batteries across the country under materially different climatic conditions. Finally, petitioners note that there is no evidence substantiating the Secretary's faith in new and innovative controls and production techniques "looming over the horizon" to reduce emission levels. Expert testimony disclosed that major new developments in coke production require a minimum of ten years to implement. Petitioners argue that section 6(b)(5) requires actual technological feasibility, not a standard that might be attained through developments now unforeseeable.
 
 
 34
 Our review of the extensive record indicates that the substance of the petitioners' argument may be substantially sound but not necessarily the conclusions they draw. The Secretary's decision to establish a 0.15 mg/m 3 exposure level, based on the evidence that coke oven emissions are carcinogenic at any level of exposure a finding which the record substantially supports was a policy judgment on the basis of the best available evidence as to what the industry could achieve in an effort to best protect its coke oven employees. This decision is not a factual determination for which we need find substantial evidence in the record to support. Under the Act, the Secretary's task combines elements of legislative policy determinations and fact finding. Industrial Union Department AFL-CIO v. Hodgson, 162 U.S.App.D.C. 331, 340, 499 F.2d 467, 476 (1974). In this instance, his ultimate determination of the appropriate exposure level is a legislative decision in the exercise of congressionally delegated powers. Even though we might have drawn different inferences from the information before the Secretary, his conclusion was reasonably drawn from the record and, therefore, it must be upheld.
 
 
 35
 Our role in reviewing this exposure limit[8] has been defined in two cases in two different circuits, Society of Plastics Industry, Inc. v. OSHA, 509 F.2d 1301 (2d Cir.), cert. denied, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975), and Industrial Union Department, AFL-CIO v. Hodgson, 162 U.S.App.D.C. 331, 499 F.2d 467 (1974). In Hodgson the D.C. Circuit reviewed the Secretary's standards regulating the atmospheric concentrations of asbestos dust in industrial work places. In that case, as in this, the Secretary made his factual determinations by analyzing often conflicting data and drawing conclusions from it: reading the record to find support for such conclusions was the proper reviewing function. Id. 162 U.S.App.D.C. at 338, 499 F.2d at 474. But there, as here:
 
 
 36
 The Secretary was obligated to establish some specific level as the maximum permissible exposure. After considering all the conflicting evidence, the Secretary explained the decision to adopt, over strong employer objection, a relatively low limit in terms of the severe health consequences which could result from overexposure. Inasmuch as the protection of the health of employees is the overriding concern of OSHA, this choice is doubtless sound, but it rests in the final analysis on an essentially legislative policy judgment, rather than a factual determination . . . .
 
 
 37
 Id. 162 U.S.App.D.C. at 339, 499 F.2d at 475. The court concluded that because "judicial review (of legislative-like decisions) inevitably runs the risk of becoming arbitrary supervision and revision of the Secretary's efforts to effectuate the legislative purposes in an area where various responses might each be legitimate in the sight of Congress," Id. 162 U.S.App.D.C. at 352, 499 F.2d at 488, it would remand only those provisions of the standard which left "nagging questions . . . as to the reason and rationale for the Secretary's particular choices." Id.
 
 
 38
 This line of analysis was followed in Society of Plastics, supra. In that case, the Second Circuit reviewed industry's challenge to the Secretary's standard governing employees' exposure to vinyl chloride emissions. The Secretary had established a permissible exposure level of one part per million (1 ppm) of vinyl chloride over an eight-hour period, to be achieved primarily through, "feasible engineering and work practice controls," id. at 1307, or through the use of respirators where the 1 ppm level could not be reached. Id. Even though no plant had been able to reach the 1 ppm level by the time of the adjudication, Justice Clark, sitting by designation, upheld the standard as reasoned decision making, writing:
 
 
 39
 We cannot agree with petitioners that the standard is so clearly impossible of attainment. It appears that they simply need more faith in their own technological potentialities, since the record reveals that, despite similar predictions of impossibility regarding the emergency 50 ppm standard, vast improvements were made in a matter of weeks, and a variety of useful engineering and work practice controls have yet to be instituted.
 
 
 40
 Id. at 1309. As in Society of Plastics, supra, the record here reveals that the coke oven industry also could with some self-confidence and determination develop "their own technological potentialities," and achieve a variety of improvements. The experience at the Fairfield and Bethlehem Steel batteries provides a sufficient basis for the Secretary's reasoned belief that the 0.15 mg/m 3 limit could be met.
 
 
 41
 The Fairfield plant had been extensively rehabilitated to include considerable, but not all, effective emission control technology, and its personnel had been trained in abatement and operating procedures. NIOSH and U.S. Steel simultaneously monitored the plant over a three-day period in seven different job classifications. More than half of the 43 results reported did not exceed the existing standard of 0.2 mg/m 3 and the NIOSH data disclosed that exposure levels in every job classification monitored were below 0.15 mg/m 3 of the BSFTPM on at least one of the three sampling days. Three job classifications were below this level on more than one day and another three measured "no detectable levels" in the monitoring samples for that day. U.S. Steel's results also revealed levels below 0.15 mg/m 3 BSFTPM in every sampled job classification on at least one testing day and all but two classifications met this level on more than one day. NIOSH also monitored worker exposure in five other coke plants for two one-week periods and each of these plants reached levels below 0.15 mg/m 3 BSFTPM for both rounds of personal sampling. Although this data was reported by coke plants rather than job classification, other monitoring results show exposure levels below 0.15 mg/m 3 for almost all job positions at plants other than Fairfield. Data submitted by Republic Steel, C F & I, and Koppers St. Paul, Minnesota, plants also demonstrate an ability to achieve levels below 0.15 mg/m 3 for numerous classifications.8a Of course, many samples were recorded above these levels but the evidence supports the Secretary's conclusion that the 0.15 mg/m 3 levels could be reached, particularly with a motivated program to attain it and the application of the recommended engineering controls and practices.[9] Furthermore, many persons testified to innovative technology currently in the experimental stage readily adaptable to old batteries.
 
 
 42
 As this court noted in Atlantic & Gulf Stevedores v. OSHA, 534 F.2d 541 (3d Cir. 1976), "it may become evident that a particular safety and health standard is economically or technologically infeasible, or otherwise unreasonable, only after employers have made a good faith effort to comply." Id. at 550. Finally, if the exposure limit cannot be met at a certain battery, even after the engineering controls and work practices are implemented, section 6(d) prudently sets up certain procedures for obtaining a variance from a standard.[10]
 
 
 43
 We believe the Secretary has made, at the least, a reasoned decision in setting the exposure limit at 0.15 mg/m 3 and we have no "nagging question" about the rationale supporting his choice. Therefore, we hold that the prescribed limits meet the technological feasibility requirement of section 6(b)(5).
 
 
 44
 (2) Economic feasibility
 
 
 45
 In the effort to safeguard the health and safety of employees in the industrial establishments throughout the land, there is nonetheless a very practical necessity to weigh economic costs. Congress did not intend to eliminate all health hazards to industrial employees at the price of crippling an industry or rendering it extinct. The role economic considerations are to play in review of the Secretary's standard was enunciated in Industrial Union Department AFL-CIO v. Hodgson, supra, 162 U.S.App.D.C. at 341, 499 F.2d at 477-78, and adopted for this circuit by Judge Gibbons in American Federation of Labor v. Brennan, supra, at 122-23. In Hodgson Judge McGowan stated:
 
 
 46
 There can be no question that OSHA represents a decision (by Congress) to require safeguards for the health of employees even if such measures substantially increase production costs. . . . (B)ut practical considerations can temper protective requirements. Congress does not appear to have intended to protect employees by putting their employers out of business either by requiring protection devices unavailable under existing technology or by making financial viability generally impossible. . . .
 
 
 47
 Standards may be economically feasible even though, from the standpoint of employers, they are financially burdensome and affect profit margins adversely. Nor does the concept of economic feasibility necessarily guarantee the continued existence of individual employers. It would appear to be consistent with the purposes of the Act to envisage the economic demise of an employer who has lagged behind the rest of the industry in protecting the health and safety of employees and is consequently financially unable to comply with new standards as quickly as other employers.
 
 
 48
 To develop a record on which the Secretary could confidently evaluate the standard's feasibility, the Department of Labor contracted with a consulting firm to analyze the coke industry's financial ability to comply with the proposed standard. This material was developed by a team of economists from the University of Utah. In addition, the Secretary was able to draw on an economic study commissioned by the AISI to determine the financial impact of the proposed standard.
 
 
 49
 These studies indicate that the standard would have an adverse impact on the coke oven industry. Estimates of the total annual cost to industry of compliance range from $240,000,000 to $1,280,000,000[11] including capital and operating and maintenance costs. Petitioners note that loss of coke production resulting from allocation of resources to meet the standards would add $980,000,000 to the direct cost. The studies also indicate that an additional 10 million manhours would be required to meet the standard. From a consumer's perspective, the cost of steel, according to the study, would likely rise about one-half of one percent.
 
 
 50
 These annual costs, petitioners contend, will inflict a severe blow to an industry already heavily burdened by financial pressures and aggressive competition from foreign producers. AISI's study found that between 1976 and 1983, the coke industry will require 39.3 billion dollars in overall capital financing, of which as much as 23 billion dollars must be externally financed. The ultimate impact of an additional financial burden might well be a cutback on expansion of the steel industry and, consequently, an increase of imported steel. Petitioners further note that OSHA's inflationary impact statement indicated that earnings per share in the industry would decline approximately 13 percent.
 
 
 51
 The Secretary was well aware of the costs to the coke and steel industry the emissions standard would generate. But the Secretary noted that record evidence demonstrated that the steel industry has been stable and profitable, with after tax earnings of seven major and five smaller steel producers exceeding $857 million per year. Furthermore, the Secretary noted the absence of any testimony from the industry spokesmen that the standard would imperil the existence of the coke industry as an affirmation of the healthy state of the industry. 41 Fed.Reg. 46748.
 
 
 52
 Although we are very sensitive to the financial implications of the standard and have endeavored to carefully weigh its effect upon the well-being of the industry, we are not persuaded that its implementation would precipitate anything approaching the "massive dislocation," American Federation of Labor v. Brennan, supra, at 123, which would characterize an economically infeasible standard. The Secretary had sufficient data from which he could properly balance the cost to industry against the health needs of its employees. The Secretary concluded:
 
 
 53
 (C)ompliance with the standard (even if the higher cost estimate were used) is well within the financial capability of the coking industry. Moreover, although we cannot rationally quantify in dollars the benefit of the standard, careful consideration has been given to the question of whether these substantial costs are justified in the light of the hazards. OSHA concludes that these costs are necessary in order to adequately protect employees from the hazards associated with coke oven emissions.
 
 
 54
 41 Fed.Reg. 46751.
 
 
 55
 We find no basis to conclude the Secretary has not fulfilled his duty to inquire into the economic feasibility of the standard, nor are we persuaded that the standard is, in fact, infeasible. We also attach significance to the United Steelworkers' strong support of the standard. If the standard turns out in reality to be economically infeasible, their members will perhaps suffer as much, if not more than, any other interested party. Accordingly, we hold that the permissible exposure limit of 0.15 mg/m 3 BSFTPM also meets the economic feasibility requirement of section 6(b)(5).
 
 IV.
 
 56
 THE POWER OF THE SECRETARY TO COMBINE A PERFORMANCE STANDARD
 
 WITH MANDATED CONTROLS AND PROCEDURES AND TO
 REQUIRE RESEARCH AND DEVELOPMENT
 
 57
 A. Performance standard combined with controls and procedures
 
 
 58
 Petitioners contend that combining a performance standard with mandatory controls and procedures exceeds the Secretary's power. In support of their attack on this "double-barrelled" standard, petitioners point to the statutory grant of power, section 6(b)(5), which states "whenever practicable, the standard promulgated shall be expressed in terms of objective criteria and of the performance desired." 29 U.S.C. § 655(b)(5) (1970). Then, petitioners point to section 6(b)(7) which states: "where appropriate, such standard shall also prescribe . . . control or technological procedures." 29 U.S.C. § 655(b)(7) (1970). Petitioners argue that when a performance standard has been adopted under section 6(b)(5) the additional imposition of specific engineering controls under section 6(b)(7) to achieve that level is clearly not "appropriate" because "(s)etting forth inflexible requirements of particular methods would be effective only if the Secretary could anticipate all possible problems and devise a uniform approach appropriate to each." Industrial Union Department v. Hodgson, supra, 162 U.S.App. at 338, 499 F.2d at 484. Furthermore, petitioners note that the Secretary rejected imposition of specific controls in the proposed rules. Petitioners argue that because the record contains no evidence to rebut that prior conclusion, and because the standard makes no effort to explain the change, the Secretary is foreclosed from requiring industry to apply controls he had previously rejected. SOCMA I, supra, at 1160.
 
 
 59
 Petitioners' contention as to the propriety of the "double-barrelled standard" is devoid of support. First, section 6(b)(5) authorizes the Secretary to set "the standard which most adequately assures . . . that no employee will suffer material impairment of health." 29 U.S.C. § 655(b)(5) (1970). We discern nothing in the language cited by petitioners in sections 6(b)(5) and (7) to indicate lack of power to combine a performance standard with controls and procedures. Second, petitioners' reliance on the language from Hodgson is misleading for while the court approved non-mandatory controls for certain aspects of a plan to reduce asbestos concentrations, the decision did uphold a standard in which the Secretary combined a maximum permissible exposure level with certain required work practices. 162 U.S.App.D.C. at 347, 499 F.2d at 483. Third, because the statutory objective is to adequately assure that employees will not suffer material impairment of health while at work, it becomes self-defeating to bar the use of reasonable and effective engineering controls and work practices to achieve such purpose.
 
 
 60
 Furthermore, we disagree with petitioners' contention that the Secretary failed to explain his policy reversal in requiring work practices and engineering controls. At 41 Fed.Reg. 46760 the Secretary stated:
 
 
 61
 (T)he final rule, unlike the proposal requires specific minimum engineering and work practice controls for byproduct coke ovens, which constitute about 99% of the coking industry. OSHA believes this approach is appropriate because (1) while there are some differences among the 65 coke oven plants with 236 coke oven batteries, their design and operation are similar; and (2) much of the technology which is required by the final rule has been available for some time. . . . (W)e are confident that as described more fully below the specified controls will significantly reduce employee exposures and that these controls represent minimum controls which are necessary to protect employee health.
 
 
 62
 Based on the record developed in the informal rulemaking proceedings, including the advisory committee, the agency has determined that the engineering controls and work practices specified below are the essential minimum constituents of an effective emission control program and that they are technologically feasible on nearly all of the existing coke oven batteries.
 
 
 63
 We believe the Secretary's policy decision to require implementation of work practices and engineering controls in combination with a performance standard is supported by the record and that discussion of the requirement in the standard meets the SOCMA I test of supplying a reasoned analysis reflecting considerations of relevant factors.
 
 B. Required research and development
 
 64
 The Secretary's standard requires that if, after implementation of all the required controls, the permissible exposure limit has not been met by January 20, 1980,
 
 
 65
 employers shall research, develop and implement any other engineering and work practice controls necessary to reduce exposure to or below the permissible exposure limit.
 
 
 66
 41 Fed.Reg. 46785.
 
 
 67
 Petitioners attack this requirement contending that requiring employers to engage in unlimited research and development is not authorized by the Act. Although the Secretary may "raise standards which require improvement in existing technologies or which require the development of new technology," Society of Plastics Industry, Inc. v. OSHA, supra, at 1309, petitioners note that the Secretary's technology-forcing power is limited to technology that "looms on today's horizon." American Federation of Labor v. Brennan, supra, 530 F.2d at 131. The petitioners also contend that the requirement is fatally vague, providing no indication of the limit or magnitude of the employer's obligation. The Government maintains that the requirement is valid "technology-forcing" and that it is not fatally vague.
 
 
 68
 29 U.S.C. § 665(b)(5) grants authority to the Secretary to develop and promulgate standards dealing with toxic materials or harmful agents "based upon research, demonstrations, experiments, and such other information as may be appropriate." Under the same statutory provision the Secretary is directed to consider the latest scientific data in the field. As we have construed the statute, the Secretary can impose a standard which requires an employer to implement technology "looming on today's horizon," and is not limited to issuing a standard solely based upon technology that is fully developed today. Nevertheless, the statute does not permit the Secretary to place an affirmative duty on each employer to research and develop new technology. Moreover, the speculative nature of the research and development provisions renders any assessment of feasibility practically impossible. In holding that the Secretary lacks statutory authorization to promulgate the research and development provision, we note in passing that we need not reach petitioners' challenge to the provision as fatally vague. Accordingly, we hold the research and development provision of the standard to be invalid and unenforceable.
 
 V.
 
 69
 THERE IS SUBSTANTIAL EVIDENCE IN THE RECORD TO SUPPORT THE
 
 VARIOUS MANDATED CONTROLS AND PROCEDURES
 
 70
 Conceding the usefulness and record support of many of the Secretary's mandated controls and procedures, petitioners nevertheless contend that several of them are wholly without support in the record. In particular, they point to: (1) the frequency of monitoring, (2) the protective clothing and hygiene facilities and practices, (3) the regulated area definition, (4) the requirement to employ the following engineering controls and work practices: (a) cleaning of flues and related equipment at least weekly, (b) mechanized gooseneck and stand pipe cleaners, (c) inspection of gooseneck and stand pipes, oven roofs, steam aspiration systems, and steam nozzles and liquor sprays before each charge, (d) filtered air to door machine cabs. Furthermore, petitioners contend that as to the inspection, cleaning, and maintenance provisions, the Secretary did not request information on all possible problems that might be encountered with such provisions, and hence, they must fail.
 
 
 71
 Petitioners also challenged the requirements of a quantitative fit test for respirators. The Government's brief conceded that the provision was unsupported and indicated that it would not be enforced. In light of that concession, we strike down that provision.
 
 
 72
 Having searched the record thoroughly, we find sufficient basis to uphold the Secretary's mandated controls and procedures. Although our review indicates that one or more of the controls may not be practicable at some of the batteries, we note that the controls are mandated "except to the extent that the employer can establish that such controls are not feasible." 41 Fed.Reg. 46785.[12]
 
 
 73
 Finally, petitioners' argument that the inspection, cleaning, and maintenance provisions do not fall within the scope of the proposed standards is without merit. Petitioners are correct that the proposed rule did not request information as to all possible problems that might be encountered with such provision. But the proposed rule did state:
 
 
 74
 On the basis of the record, compiled by the advisory committee and OSHA's current compliance activity under the existing standard, it is apparent that it is technologically feasible to reduce employee exposure to or below the permissible exposure limit through the implementation of engineering, work practice, and personal protective controls. Information is requested as part of the proceeding as to the feasibility of reaching the permissible exposure limit solely through the use of engineering controls and supplementary work practices including the question of retrofitting existing coke oven batteries with new technology. In addition, information is sought as to any specific difficulties associated with the supplementary work practices and personal protective controls which might affect the feasibility of reducing exposure to the permissible exposure limit.
 
 
 75
 In the preceding paragraph the proposed rule stated:
 
 
 76
 In order to provide some information and guidance as to the technology currently available and its application to existing and rehabilitated or new batteries, a list of some engineering controls and work practices is included as appendix B to the standard. 40 Fed.Reg. 32273.
 
 
 77
 Appendix B listed the engineering controls and work practices, now part of the standard, that the Secretary felt would be effective in controlling coke oven emissions. 40 Fed.Reg. 32281-82. We believe this gave petitioners sufficient notice of the controls and procedures ultimately required in the standard.
 
 VI.
 
 78
 INCLUSION OF NON-COKE OVEN EMPLOYERS WITHIN THE SCOPE OF THE STANDARD
 
 
 79
 Petitioners contend that because the proposed standard afforded no notice to non-coke oven employees that they would be covered by the standard, the Secretary failed to comply with minimum requirements of due process. Petitioners assert that there was no explanation why independent contractors, who repair, maintain or otherwise service the batteries, were included within the standard, that there was no consideration of alternative measures designed exclusively for independent contractors, and that there was no consideration of the feasibility of applying the standards to independent contractors. Petitioners therefore conclude that inclusion of non-coke oven employers in the standard's coverage runs afoul of the SOCMA I test for upholding the Secretary's standard.
 
 
 80
 We are not wholly persuaded by this argument. From a purely practical perspective, it would make little sense to apply a health standard to only one group of employees; employees of independent contractors suffer the effects of carcinogens as well. To protect maintenance and repair workers, the standard provides that compliance with the exposure limit may be achieved using only respirators "in work operations such as maintenance and repair activity in which engineering and work practice controls are technologically not feasible. 41 Fed.Reg. 46787. We read this provision as applicable to and intended for independent contractors.
 
 
 81
 In the proposed standard, submission of written comments, data, and arguments were requested from "any interested party." 40 Fed.Reg. 32268. Moreover, the proposed standard stated that coverage was to extend to "employee exposure" to coke oven emissions, without in any way limiting that coverage to coke-oven employees. 40 Fed.Reg. 32273. In a matter of such vital importance, however, we find it difficult to conclude that the notice given to the coke producers constituted notice of the proposed standards to the non-coke-oven employers.
 
 
 82
 We recognize that there are serious problems unique to those independent contractors engaged in the construction, maintenance, and repair of coke oven batteries. In this petition, filed by coke producers to review the feasibility of these regulations, the independent contractors have not even filed an amicus brief. Because we are well aware of the adverse impact full application of the standard to independent contractors might entail, and because the standard does not specifically address the particular problems faced by independent contractors, we have serious reservations concerning the broad construction of the standard's applicability to independent contractors contained in the March 3, 1977, letters by the Acting Assistant Secretary of Labor, Bert Concklin (App. 6519). The petition for review, therefore, insofar as it applies to the non-coke-oven employers will be remanded for further proceedings not inconsistent with this opinion.
 
 VII.
 CONCLUSION
 
 83
 Accordingly, the petitions for review will be denied and the Secretary's coke oven emissions standard affirmed except: (1) insofar as the Secretary requires the petitioners to research and develop any other engineering and work practice controls necessary to reduce exposure to or below the permissible exposure limit, 29 C.F.R. § 1910.1029(f)(1)(i)(b), (f)(1)(ii)(b), (f)(1)(iii)(b), (f)(6) (iii), (2) the provision relating to the requirement of a quantitative fit test for respirators, 29 C.F.R. § 1910.1029(g)(4)(i), and (3) application of the standard to non-coke-oven employers. As to the first two mentioned requirements, the applicable sections of the coke emissions standard will be vacated, and as to the last requirement, we remand for further proceedings consistent with this opinion.
 
 
 84
 Each party to bear its own costs.
 
 
 85
 This cause came on to be heard on the certified list in lieu of the record from the Assistant Secretary of Labor for Occupational Safety and Health, United States Department of Labor, and was argued by counsel on January 5, 1978.
 
 
 86
 On consideration whereof, it is now here ordered and adjudged by this Court that the petitions for review of the Order of the Occupational Safety and Health Administration, United States Department of Labor, promulgated October 19, 1976, be, and the same are hereby denied and the Secretary's coke oven emissions standard affirmed except: (1) insofar as the Secretary requires the petitioners to research and develop (as defined in the court's opinion) any other engineering and work practice controls necessary to reduce exposure to or below the permissible exposure limit, 29 C.F.R. § 1910.1029(f)(1)(i)(b), (f)(1) (ii)(b), (f)(1)(iii)(b), and (f)(6)(iii), (2) the provision relating to the requirement of a quantitative fit test for respirators. 29 C.F.R. § 1910.1029(g)(4)(i), and (3) application of the standard to non-coke-oven employers. As to the first two mentioned requirements, the applicable provisions of the coke oven emissions standard are vacated, and as to the last requirement, the cause is remanded for further proceedings consistent with the opinion of this Court. Each party to bear its own costs.
 
 
 
 *
 Donald W. Van Artsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The petitioners are: American Iron and Steel Institute, Jones & Laughlin Steel Company, National Steel Corporation, Sharon Steel Corporation, Shenango, Inc., United States Steel Corporation, Wheeling-Pittsburgh Steel Corporation, the American Coke and Coal Chemicals Institute, Bethlehem Steel Corporation, Crucible Materials Group, Youngstown Sheet & Tube Company, Republic Steel Corporation, C F & I Steel Corporation, Cyclops Corporation and Inland Steel Company
 
 
 [2]
 The standard may be found in 41 Fed.Reg. 46742-46790, (to be codified at 29 CFR § 1910.1029)
 Under the Act, the Secretary of Labor is charged with primary responsibility for developing occupational safety and health standards. In practice, however, he has delegated this function to the Assistant Secretary of Labor for Occupational Safety and Health who is the chief administrative officer of the Occupational Safety and Health Administration (OSHA). References in this opinion to the Secretary and OSHA are used interchangeably.
 
 
 [3]
 Petitioners also contend that the Secretary failed to comply with minimum requirements of due process for rulemaking by not providing adequate notice of the standard. Our review of the record reveals no support for this contention
 Petitioner C F & I Steel Corporation asserts that the Secretary acted capriciously in adopting a nationwide coke oven standard without considering evidence that environmental cofactors in Colorado shield C F & I's workers from the carcinogenicity of coke oven emissions. We are not persuaded by this argument. The study upon which C F & I relied was based upon the health statistics of 470 employees, while the studies upon which the Secretary relied were based on approximately 59,000 and 35,000 employees. The vastly superior statistical significance of those studies provides a rational basis for the Secretary to disregard the C F & I study.
 Finally, Republic Steel Corporation argued in its brief that respirators should be used in an effort to comply with the permissible exposure limit. The Secretary's brief conceded that respirators, although not a first choice measure for reducing employees' exposure, could be used until engineering controls and work practices were fully implemented, or where those controls could not reduce exposure to the prescribed limit. In light of that concession, we need not reach that argument.
 
 
 [4]
 "Coal tar pitch volatiles" is a generic term and refers to organic material present on particulate matter. Because benzene is a solvent for such material, CTPV are in practice measured as the benzene-soluble fraction of the total particulate matter ("BSFTPM") found in any environment
 
 
 [5]
 For example, the senior environmental chemist and toxicologist for Bethlehem Steel stated at the hearings that coke oven emissions were "a cause" of observed excess incidents of lung cancer among coke oven employees
 
 
 [6]
 In discussing the permissible exposure limit, the report in pertinent part states:
 Experimental data suggest that cocarcinogenic agents may play a critical role in the development of lung cancer. In addition, epidemiological evidence indicates that certain environmental cofactors may potentiate the risk of developing lung cancer. Experimental data and epidemiological evidence provide important clues as to the specific roles of the multiple chemical agents and physical stresses in the complex environment of coke ovens which result in the development of cancer.
 Since coke oven emissions are carcinogenic and there is no scientific data to demonstrate that there is a safe level of exposure to carcinogens, the basis of this standard must be "no exposure." (Emphasis supplied.)
 
 
 [7]
 A level of zero exposure could not be set because there is some naturally occurring background presence of the measured substance in the air which cannot be removed from the environment. Because benzopyrene ("BAP") was one of the most potent components of coke oven emissions and largely responsible for their carcinogenic potency and is to some extent ubiquitous in the environment, the Committee tailored its recommendation from zero to 0.02 ug (micrograms) /m 3
 
 
 [8]
 For an enlightening discussion of the problems judges face in reviewing technical standards, see Judge Oakes' article, The Judicial Role in Environmental Law, 52 N.Y.U.L.Rev. 498 (1977)
 8a In developing a record on which the agency could confidently evaluate the standards' feasibility, the Secretary contracted with a consulting firm to analyze the ability of the coking industry to comply. The analysis relied on raw data collected from coke producers, their suppliers, industry trade associations, labor unions, and government agencies. It concluded that the pertinent proposed engineering controls were technologically feasible.
 
 
 [9]
 An illustration of the technological feasibility of the standard is Bethlehem Steel's experience in reducing emission levels at its Johnstown plant. A drastic drop in emission concentration in larry car cabs from an average of 3.0 to 0.09 mg/m 3 was accomplished by filtering air in the cabs and exercising other controls and work practices. The mere filtering of air in the larry car cabs was sufficient to reduce the level from 0.71 to 0.10 mg/m 3
 
 
 [10]
 29 U.S.C. § 655(d) (1970) provides in pertinent part:
 An affected employer may apply to the Secretary for a rule or order for a variance from a standard promulgated under this section.
 
 
 [11]
 Counsel for Republic Steel stated in oral argument that industry accepts the $240,000,000 figure
 
 
 [12]
 Petitioners contend that the burden of proof to establish the need for a section 6(d) variance, 29 C.F.R. § 1905.11(b)(4), is virtually impossible to carry. The regulation reads in pertinent part:
 An application (for a variance) . . . shall include: (4) a statement showing how the conditions, practices, means, methods, operations, or processes used or proposed to be used would provide employment and places of employment to employees which are as safe and healthful as those required by the standard from which a variance is sought.
 Considering the Secretary's mandated concern for the health of industrial employees, we do not find this burden of proof for a variance from a proper OSHA health standard to be unreasonable or imposing an undue hardship.